Charles W. GROSS, M. D. and James A. Grant, M. D., Plaintiffs,

v.

UNIVERSITY OF TENNESSEE and Charles B. McCall, Dean of College of Medicine, Defendants.

No. 77–2162.

United States District Court, W. D. Tennessee, W. D.

April 12, 1978.

Irvin M. Salky, Memphis, Tenn., for plaintiffs.

Beauchamp E. Brogan, Gen. Counsel, Alan M. Parker, Staff Atty., Knoxville, Tenn., for defendants.

## MEMORANDUM OPINION

WELLFORD, District Judge.

In this civil rights and antitrust action,[1] plaintiffs, former professors of medicine at the University of Tennessee Center for the Health Sciences (UTCHS), challenge their dismissals from their teaching and administrative posts. Drs. Gross and Grant were both full-time, tenured faculty members. In addition, Dr. Gross was Chairman of the Department of Otolaryngology. During the early part of 1977, both plaintiffs were suspended from the faculty at UTCHS, and Dr. Gross was removed from his position as department chairman as a result of their refusal to sign Medical Practice Income Agreements (MPIA), which was required of all full-time UTCHS faculty members. Plaintiffs were ordered reinstated without pay by this Court pending a hearing relating to their suspensions. On April 22, 1977, after a full hearing had been afforded plaintiffs, a seven-member faculty committee found that "adequate cause", as defined in UTCHS' *Faculty Handbook*,[2] existed for the termination of plaintiffs. This decision was appealed to the full Board of Trustees of the University, which sustained the terminations for cause, and also upheld Dean McCall's dismissal of Dr. Gross as department chairman in the middle of the academic year.

Since 1958, UTCHS has had a policy of limiting the outside income of professors in order to insure that they devote maximum energy to their teaching duties. The policy was in effect when both plaintiffs were initially hired at UTCHS. Dr. Farmer, now Chancellor, assumed the position of Dean in 1972. Upon learning that plaintiffs had not signed an income limiting agreement, Dr. Farmer informed plaintiffs that they would have to do so in order to remain on the faculty and maintain a private practice. This was delayed, however, due to the fact that the faculty was in the process of investigating new ways to handle income limiting agreements and receipt of patient revenue.

As a result of this investigation, the faculty voted in 1973 to retain income limiting

1. The action was originally brought under 42 U.S.C. § 1983, with jurisdiction predicated upon 28 U.S.C. § 1343(3). In the amended complaint, plaintiffs alleged violations of 15 U.S.C. §§ 1, 2 and 13(a), with jurisdiction predicated upon 15 U.S.C. §§ 15 and 26, 28 U.S.C. § 1337.

2. "*Procedures for Termination of Tenured, Special or Probationary Appointed Personnel.* The services of tenured faculty members, special or probationary appointed faculty members prior to the end of a specified term, may be terminated for (1) adequate cause; . . .

(1) 'Adequate cause' for termination consists of incompetence or moral turpitude. Incompetence is a seriously unsatisfactory level or manner of performance of assigned duties. It may include or consist of willful neglect of duty or defiance of assigned duties."
UTCHS *Faculty Handbook*, § 5–5.
On March 21, 1977, a three-member committee of the Board of Trustees upheld Dean McCall's mid-year termination of Dr. Gross as Chairman of the Department of Otolaryngology.

agreements and approved a proposal to set up a professional corporation through which the income limiting agreements would be administered. A trust agreement was signed by all department chairmen, including Dr. Gross, which authorized the formation of the Faculty Medical Practice Corporation (FMPC). The faculty, through its department chairmen, signed an agreement with FMPC that required each faculty member to sign an MPIA every year. Having so agreed, plaintiffs refused throughout 1975 to execute an MPIA.

On January 22, 1976, Dean McCall, who replaced Dr. Farmer when Dr. Farmer became Chancellor, wrote letters to plaintiffs requiring that they sign MPIA's by January 23 or resign. Based on their signing MPIA's covering the period from March 15, 1976, to June 30, 1976, both plaintiffs were reappointed for the 1976–77 year and Dr. Grant was granted tenure.

The next year, however, plaintiffs refused to sign the MPIA. On January 1, 1977, Gross was relieved of his chairmanship for failing to have the members of his department sign MPIA's. Gross appealed this decision to the President of the University, stating that unresolved issues concerning rental of office space and the purchase of his equipment by FMPC were the reasons why he had not signed his MPIA. Dr. McCall conceded these two issues to Gross, who still refused to sign the agreement. Because of repeated refusals to sign the agreement when instructed, Dr. McCall suspended both plaintiffs on March 4, 1977.

Defendants have moved for summary judgment on all issues raised in the pleadings. Defendants have submitted briefs and affidavits in support of their position, and have filed as exhibits transcripts of the administrative hearings relating to plaintiffs' terminations. The Court has considered the briefs in the cause. No material issue of fact now appears to exist in the case, and defendants are entitled to judgment as a matter of law.

## I. THE § 1983 CLAIM:

Defendant, University of Tennessee (U.T.), maintains that it is not a "person" within the purview of 42 U.S.C. § 1983, and that the claim under that section must be dismissed. The current weight of authority appears to be that state universities are not such "persons", and may not be sued under § 1983 because the university is a state agency or body corporate. *Prostrollo v. University of South Dakota,* 507 F.2d 775 (8th Cir. 1974), *cert. den.* 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975); *Blanton v. State University of New York,* 489 F.2d 377 (2d Cir. 1973). Cf. *Gay Students Org. of University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir. 1974) (dictum); *Sellers v. Regents of University of California,* 432 F.2d 493 (9th Cir. 1970), *cert. den.* 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971) (Board of Regents not person). Contra *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974); *Marin v. University of Puerto Rico,* 377 F.Supp. 613 (D.P.R.1975).

This Court has previously held that U.T. at Martin is a § 1983 person. *Green v. University of Tennessee at Martin,* No. 74–60–E (W.D.Tenn., filed June 26, 1975), *aff'd. without opinion,* 542 F.2d 1175 (6th Cir. 1975) (order of affirmance did not address jurisdictional question, but affirmed denial of relief under § 1983). The Court cited as authority *Soni v. Board of Trustees of University of Tennessee,* 376 F.Supp. 289 (E.D. Tenn.1974), *aff'd.* 513 F.2d 347 (6th Cir. 1975), noting its reservation in holding that U.T. is a § 1983 person.

It should be noted that *Soni* did not hold that defendant here was in fact a person within the purview of § 1983. *Soni* decided that, assuming U.T. is a state agency, the state had waived Eleventh Amendment protection for U.T. by allowing it to sue and be sued in all courts. Since the *Soni* decision, however, the Tennessee General Assembly has expressed its specific intent that the charter provision not be construed as an implied waiver of Eleventh Amendment protection for the University.[3] Subsequent

---

**3.** TCA § 20–1702 has, since the *Soni* decision, been amended to provide:

"No statutory or other provision authorizing the University of Tennessee and its Board of

decisions of the Sixth Circuit cast some doubt, moreover, as to the continued vitality of *Soni.* See *Martin v. University of Louisville,* 541 F.2d 1171 (6th Cir. 1976); *Long v. Richardson,* 525 F.2d 74 (6th Cir. 1975).

■ The Court sustains defendant's contention that the University of Tennessee is not a person within the purview of 42 U.S.C. § 1983. Although Dean McCall is a person for purposes of this section, the complaint does not contain sufficient allegations to charge him with personal liability. *Martin v. University of Louisville, supra.* The § 1983 claim is accordingly dismissed.

## II. THE § 1331 CLAIM:

Plaintiffs seek to amend their complaint to allege claims under 28 U.S.C. § 1331, for violations of their Fourteenth Amendment rights. Defendant apparently has no objection to the amendment, and the Court will, therefore, consider the substance of plaintiffs' constitutional claims. See *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

### a. *The Due Process Claim:*

Plaintiffs claim that they have a right, which is protected by the due process clause of the Fourteenth Amendment, to engage in the unlimited private practice of medicine outside of their teaching positions.[4] It appears that although this point has been addressed in dicta in various decisions, it has never been squarely confronted in a reported case. The cases cited by defendants indicate that there is no constitutional right to engage in unlimited employment outside of a government position. See *Trister v. University of Mississippi,* 420 F.2d 499 (5th Cir. 1969); *Orr v. Keefoot,* 377 F.Supp. 673 (D.Neb.1974). Courts have noted that practice-limiting regulations are rationally related to the policy of requiring school personnel to devote full time to the duties for which they were employed. *Gosney v. Sonora Independent School District,* 430 F.Supp. 53 (N.D.Tex.1977); *Atkinson v. Board of Trustees of University of Arkansas,* 559 S.W.2d 473 (Ark.1977). Compare *Cook County College Teachers Union, Local 1600 v. Taylor,* 432 F.Supp. 270 (N.D.Ill. 1977), and *Kountz v. State University of New York,* 89 Misc.2d 483, 391 N.Y.S.2d 942 (Sup.Ct.1977); subsequently reversed on appeal, 402 N.Y.S.2d 426 (App.Div.1978).

■ Bearing in mind that federal courts are to play an extremely limited role in reviewing the merits of personnel decisions made by public agencies, *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Court holds that plaintiffs have no constitutional right to engage in the unlimited private practice of medicine while holding a public position of employment. The Court further holds that the income limiting agreements utilized were rationally related to the espoused legitimate goals of fostering full-time devotion to teaching duties. *Gosney v. Sonora Independent School District, supra.* The termination of plaintiffs by defendants for their refusal to sign the agreements infringed no constitutionally protected right of plaintiffs.

### b. *The Equal Protection Claim:*

■ Plaintiffs claim that there are or may be members of the UTCHS faculty who have not signed MPIA's and yet have not been terminated by defendants. Disparate treatment of this sort has been held to constitute a violation of the Equal Protection Clause of the Fourteenth Amendment. *Trister v. University of Mississippi, supra; Orr v. Keefoot, supra.* It should be noted, however, that the transcripts of the administrative proceedings in this case do not bear out plaintiffs' contentions. Particular-

---

Trustees to sue and be sued shall constitute a waiver of sovereign immunity."
[1977] Tenn.Pub.Act, Chap. 170, § 1 (effective May 9, 1977).

4. Plaintiffs advance no claim that their rights to procedural due process have been violated in light of extended administrative hearings afforded them.

ly in the testimony of Dean McCall, it is asserted, without refutation, that all members of the full-time faculty at UTCHS were required to, and did, sign an MPIA. In light of the weight of the evidence in the record to the contrary, plaintiff Gross' assertion that he has knowledge of one UTCHS faculty member who has not signed an MPIA is not sufficient to raise a material issue of fact. Defendants' motion is, accordingly, granted with respect to plaintiffs' equal protection claim.

## III. NOTICE PROVISIONS:

■ Plaintiffs claim that they were entitled to twelve months notice prior to their terminations. This argument is derived from § 5–4 of the UTCHS *Faculty Handbook* which, in dealing with probationary employees, states: "If the individual has served two or more years at the University, such notice will be given no later than twelve months before the expiration of the appointment." Plaintiffs argue that as full-time tenured faculty members they should be entitled to as much notice as probationary employees. The termination proceedings against plaintiffs, however, were brought under the "Procedures for Termination of Tenured, Special or Probationary Appointed Personnel" which allow termination *"Prior to the end of a specified term"* for adequate cause.[5] The twelve month notice provisions were intended to apply to a probationary employee who was not being reappointed for reasons not amounting to adequate cause. Plaintiffs were therefore not entitled to twelve months notice prior to their dismissals, when the faculty committee found that adequate cause for their terminations existed.[6]

## IV. ANTITRUST CLAIMS:

■ Defendants have moved for summary judgment on the antitrust claims on the grounds that (1) the University is immune from suit under the "state agency" doc-

trine, and (2) plaintiffs have failed to state a claim under the various sections of the antitrust statutes cited. The recent Supreme Court decision in *City of Lafayette, Louisiana, et al. v. Louisiana Power & Light Company,* —— U.S. ——, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), casts some doubt on the applicability of the "state agency" doctrine to this particular type of regulation. This question is not necessary to a conclusion of this controversy, however, because plaintiffs, under the circumstances alleged in the complaint, have not demonstrated that they are entitled, as a matter of law, to any sort of relief under the antitrust statutes. The relationship between the parties was simply that of employee-employer and the antitrust allegations do not lie under these circumstances.

## V. CONCLUSIONS:

While deciding in favor of defendants, it should be noted that at no time did the University ever question the qualifications or professional competence of plaintiffs, and this decision does not in any way impugn their integrity or professional competence. Although vigorously represented by capable counsel, plaintiffs have simply failed to demonstrate that they are entitled to any relief on any grounds asserted.

A summary judgment is granted for defendants on all grounds asserted.

---

5.  See note 2, *supra.*

6.  The Court likewise finds no merit to plaintiff Gross' contention that defendant could not re-

lieve him as department chairman prior to June 30, 1977.